

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 21, 2023

**VIA ECF**
The Honorable Lorna G. Schofield
United States District Judge
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States v. Eric Lira*, 22 Cr. 151 (LGS)

Dear Judge Schofield:

    Eric Lira ("Lira" or the "defendant"), now stands convicted for participating in a corrupt "doping" scheme intended to give Olympic athletes a competitive advantage in international competition through the administration of prohibited performance-enhancing drugs ("PEDs"). (*See* Presentence Investigation Report ("PSR") ¶ 37). This represents the first conviction under the Rodchenkov Anti-Doping Act ("RADA"), a statute passed with the specific aim of combating efforts to undermine the fairness and integrity of international sport. The drugs that Lira provided to athletes, and to intermediaries who connected Lira with those athletes, were illicit not only because they were forbidden under the governing athletics rules, but also because those drugs were not approved for distribution in the United States.

    Lira's conduct was even more insidious because he falsely set himself out as a medical professional, publicly representing himself to be a "naturopathic doctor." He, in fact, had no medical qualifications that authorized him to distribute or prescribe the drugs he provided. The defendant's illicit efforts, with others, to manipulate the outcome of Olympic events is serious conduct meriting a serious punishment.

    The defendant's request for a non-incarceratory sentence does not account for the profound transgressions the defendant and others committed. As detailed herein, and consistent with the recommendation of the U.S. Probation Department, the Government respectfully submits that a sentence that includes a term of incarceration is necessary to reflect, among other things, the seriousness of the defendant's conduct and the need to promote deterrence, and is thus sufficient but not greater than necessary to further the legitimate purposes of sentencing.

## I. Offense Conduct

Beginning in the Fall of 2020, up to the Tokyo Olympics, which were held in the Summer of 2021, the defendant engaged in efforts to provide illicit PEDs to multiple athletes from multiple countries, each of whom were intent on corruptly gaining a competitive edge in the Olympic games. As early as November 2020, Lira and a particular Olympic athlete, who competed on behalf of Nigeria ("Athlete-1"), exchanged messages discussing the acquisition of various prohibited PEDs, including human growth hormone, insulin-like growth factor, TB-500, gonadotropin, and "honey," a code term for erythropoietin, a blood builder. (PSR ¶¶ 23-25).

Months later, beginning on June 1, 2021, Athlete-1 ordered drugs from Lira on behalf of Athlete-1 and another athlete, writing, "List of this we will need also / honey / iron / glucose water / igf / Tb 500 / Epo." (PSR ¶ 28). Athlete-1 in fact received these drugs from Lira, who appeared to have sourced the drugs in Mexico and shipped them to Athlete-1 in the United States. (PSR ¶¶ 15-18). In a subsequent drug test administered months after she had first requested these PEDs from Lira, Athlete-1 tested positive for human growth hormone and was suspended from competition, ultimately receiving a multi-year ban. (PSR ¶¶ 21, 32, 33). Athlete-1 was so convinced of the potency of Lira's drugs, that when Athlete-1 performed poorly, Athlete-1 wrote Lira the very next day to ask for additional drugs, (PSR ¶ 29), and when Athlete-1 performed well, Athlete-1 credited Lira, writing in a series of messages: "Eric my body feel so good," "I just ran 10.63 in the 100m on Friday," "with a 2.7 wind," "I am soooo happy," Whatever you did, is working so well." (PSR ¶ 31).

Athlete-1, however, was not the only Olympic competitor who received PEDs from Lira. Lira likewise provided drugs to an athlete competing on behalf of Switzerland in advance of the Olympic games ("Athlete-2") in the Summer of 2021, and discussed with an intermediary the detectability on drug tests of one of the prohibited drugs that Lira had provided to Athlete-2. (Indictment ¶ 4). Lira separately met with a third Olympic athlete who competed on behalf of the United Kingdom ("Athlete-3") multiple times in the Summer of 2021 for the purpose of providing him with PEDs. In short, Lira traveled across the United States to deliver and/or administer various drugs to various Olympic athletes, all with the calculated aim of impacting the outcome of the Tokyo Olympics. (*Id.*). The actual scope of Lira's offense conduct stands in sharp contrast to his narrow admission of guilt in his sentencing submission.

## II. Procedural History

The defendant was arrested at the U.S.-Mexico border and charged by Complaint on December 29, 2021. (ECF No. 1). On March 8, 2022, the defendant was indicted by the grand jury. (ECF No. 6).

After unsuccessfully litigating a motion to dismiss the Indictment, on May 8, 2023, the defendant appeared before the Honorable Valerie Figueredo, U.S. Magistrate Judge for the U.S. District Court for the Southern District of New York, and pleaded guilty, pursuant to a plea agreement, to a Superseding Information charging the defendant with one count of violating RADA. (PSR ¶ 6). Lira's change of plea took place approximately one month before his scheduled trial.

### III.   Sentencing Factors

####     a.  Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

####     b.  Discussion

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate general and specific deterrence. Some term of imprisonment is the appropriate sentence here—one sufficient but not greater than necessary to serve the purposes of sentencing.

First, the scope and impact of the defendant's offense conduct merits a term of imprisonment. Lira's scheme imposed a significant harm on the athletes who were slated to compete in the Olympic games, and who adhered to the applicable rules that prohibit drug abuse and ensure fair competition. The defendant's efforts to compromise the outcome of those events had a deep and meaningful impact on compliant Olympic athletes and on the integrity of the sport. The defendant's offense conduct was not the result of a single lapse in judgment. The defendant

engaged in the offense conduct for months: he traveled across states; he discussed logistics and dispensed advice over scores of communications with co-conspirators; he engaged in repeated and persistent efforts to help athletes cheat through the use of various prohibited PEDs. The defendant transported drugs into the United States from Mexico and personally traveled to administer drugs to athletes, including those who had traveled for the express purpose of meeting with Lira. That Lira engaged in this conduct with respect to numerous athletes illustrates that this was a pattern of criminal activity that depended on inherently deceitful conduct and practices. Moreover, Lira presented himself as a medical professional, which conveyed a false semblance of legitimacy over the drugs he was obtaining, dispensing, and administering. In short, the defendant's conduct was premeditated, deliberate, and sustained. It was not confined in time or scope. And there is no indication that the defendant would have ceased corruptly distributing drugs to athletes absent his arrest.

A sentence to a term of imprisonment is further necessary given that the defendant misapprehends the seriousness of his offense. The defendant's plea allocution and sentencing submission focus solely on Lira's assistance to Athlete-1, eliding over the fact that: (i) he provided drugs to multiple athletes, and that (ii) even Athlete-1 expressly informed Lira that Athlete-1 was obtaining drugs on behalf of another competitor. Lira's narrow focus in his submission on his personal relationship with Athlete-1, (*see* Def. Sent. Subm. at 2 (ECF No. 56)), reflects Lira's steadfast refusal to accept responsibility for the full extent of his conduct. Further, Lira's suggestion that his "conduct was the most innocuous violation of RADA one could imagine," (*Id*. at 3), is deeply misplaced. That skewed perspective is predicated on Lira's self-serving minimization of his offense conduct. Lira did not merely provide drugs to a single friend who took advantage of their relationship. (*Id.* at 2). He did not engage in only a modest or technical violation of the governing rules of sport. He assisted multiple athletes in obtaining multiple types of drugs and traveled to multiple states in his efforts to assist others in cheating. The drugs he provided, which included a blood builder, were among the most potent PEDs that an athlete can use, and have the greatest potential to impact an athlete's performance and improve their chance of securing a gold medal. Lira's conduct amounted to a gross and intentional effort to undermine multiple Olympic events. Ultimately, the defendant's failure to acknowledge the extent of his offense conduct counsels in favor of a term of imprisonment to achieve the goals of sentencing.

Finally, there is a significant need to promote general deterrence, which goal will be furthered by a term of incarceration. The defendant's offense conduct, had it been successful, would have marred the integrity of the Olympic games, an impact that is difficult to quantify, and a harm that RADA specifically sought to avoid. The passage of RADA was spurred by the detection of a significant and widespread doping scheme perpetrated by Russian sports organizations, coaches, and athletes during the Winter Olympic Games in Sochi, Russia.[1] RADA was passed in response to the systemic violations that came to light in the wake of that event. RADA's purpose is, among other things, to "serve as a deterrent to those considering engaging in doping fraud" and "to gain visibility into a wider net of international corrupt practices that are

---

[1] *See* Genevieve F.E. Birren, *The Rodchenkov Anti-Doping Act: The United States' Response to the Russian Doping Scandal*, 32 MARQ. SPORTS L. REV. 241 (2022), *available at* https://scholarship.law.marquette.edu/sportslaw/vol32/iss1/13.

connected to doping fraud."[2] To the extent others are contemplating, or conspiring to, assist athletes in gaining a competitive advantage through doping, this Court should send a strong message that such pernicious conduct is harmful, criminal, and will result in prison time. The fact that this conduct is particularly difficult for regulatory and oversight bodies to detect should be considered by the Court in imposing sentence. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (same). A lenient sentence runs the risk that individuals like Lira who are caught violating RADA will assume that they will have the means and wherewithal to escape the consequences of their conduct and, even if convicted, will face only a slap on the wrist. By contrast, a sentence to a term of imprisonment will send the signal that serious consequences will follow for those who are caught violating RADA, including some term of incarceration.

## IV.   Conclusion

The Government respectfully submits that a term of imprisonment is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:   /s/ Sarah Mortazavi
Sarah Mortazavi
Assistant United States Attorney
252-637-2520

cc: Mary Stillinger, Esq. (by ECF)

---

[2] *Id.* at 246 (citing H.R. REP. NO. 116-251, at 9 (2019), https://www.congress.gov/116/crpt/hrpt251/CRPT116hrpt251.pdf).